Good morning, everyone. We have six cases on this morning's calendar. We'll begin with Appeal No. 22-2436, Douglas Mann v. LSQ Funding. Mr. Kline. Good morning, Your Honors, and may it please the Court. I'm Randy Kline, Counsel for Douglas Mann, Chapter 7 Trustee for the Estate of Angstrom, Inc. Angstrom was a fraudulent enterprise that left over a dozen creditors holding claims against the estate, primarily a claim by Millennium Funding in excess of $10 million and another 12 or 13 claims of other creditors, including several credit card companies, aggregating nearly a quarter of a million dollars. One of the creditors was lucky, LSQ. LSQ was able to get paid when they demanded, prior to bankruptcy, that the debtor repurchase invoices that had been purchased by LSQ and were fraudulent. The debtor was able to obtain new funds from a second creditor, Millennium Funding. The debtor entered into a contract with Millennium Funding. Millennium did not enter into a contract with LSQ. Millennium did not purchase the claim from LSQ. They're not the assignee of LSQ's factoring agreement. They entered into their own agreement with the debtor, pursuant to which the debtor agreed to sell invoices to Millennium in exchange for a purchase price. In order to obtain those invoices, they had to be repurchased from LSQ. In order for that to occur, the debtor directed the payment to Millennium to go from Millennium to LSQ. This was the debtor's right under the contract to obtain $10.3 million. That interest under that contract is the purchase price, or the assets that were acquired. Mr. Klein, did this payment from Millennium to LSQ have any effect on the funds that the debtor had available to pay the creditors? From a preference perspective, Your Honor, there was no adverse effect, no diminution, using the words of the earmarking doctrine, on other creditors, but that is not a requirement with respect to a fraudulent transfer. But you agree that this payment did not impact the debtor's estate at all? So, in other words, the money that the debtor had to pay creditors wasn't impacted at all? Other than LSQ? From a net effect, the answer to that question is yes. In other words, there were multiple transactions. Initially, the debtor obtained the funds. It used those funds exclusively to pay one creditor. So, when you net them out, there was no net effect. I'm sorry to interrupt. Did the debtor obtain the funds? It looks like the funds went directly to LSQ from Millennium. The debtor obtained the funds pursuant to its contract. There were only two parties to that contract, the debtor and Millennium. But never physically? There was never a physical transfer. The debtor directed Millennium. Millennium funded the payment on behalf of the debtor and at the debtor's direction to LSQ. One of the points that you're making is economically, it's the exact same. This is new financing to Engstrom, the debtor, from Millennium. They could have structured it where Engstrom received the $10 million, and then the same moment it received it, it just could have wired it out to LSQ to pay LSQ off. They could have structured it that way, Your Honor. But the fact is that because it was an invoice purchase agreement, the invoices had to be repurchased from LSQ first. For purposes of a 548A fraudulent transfer, do creditors need to be harmed? In connection with an actual intent to defraud under 548A, the answer is no. Right. I thought that haven't courts uniformly held that under 548A that you don't need to ask the question about whether creditors are harmed as a result of a fraudulent conveyance or fraudulent transfer? That's correct, Your Honor. You're looking at whether there was actual intent to hinder, delay, or defraud. Then in that case, under 548, you're looking at whether any entity was defrauded, singular. Also, under 544B, where the trustee is stepping into the shoes of a creditor, in this case, Millennium Shoes, under Wisconsin Uniform Fraudulent Transfer Act, that's also looking at actual intent to hinder, delay, or defraud a creditor. But under 548A, even though you don't have to have evidence that there was an intent to defraud the creditors or that they were defrauded, you still have to have an interest of the debtor in the property. Correct? Correct, Your Honor. There needs to be, on the face of the statute, an interest of the debtor in property. But as this Court said in the Warsco versus Preferred Technology Group opinion, when assets are transferred, the purchase price for those assets is the debtor's interest in property. So in this case, the debtor's interest in property was the $10.3 million that it received on account of the invoices that were repurchased. The new financing was the debtor's interest. Correct, Your Honor. Help me with this, Mr. Klein. I'm asking this to try to understand it as a legal matter. Why is it so significant, in your view, as a legal matter, that the challenged $10 million payment is a fraudulent transfer as opposed to a prohibited preference? One of the things that you do in your briefing is you're emphasizing fraud, fraud, fraud. And you're pointing us to 544 and 548. And you're saying, right along with that, this is not a situation where we're talking about an avoidable preference. Can you walk me through why that distinction is so significant? Yes, Your Honor. It's significant because the district court ruled as a matter of law. Once it went through an analysis under 547, it started there and determined that there was no preferential transfer by application of the earmarking doctrine, which is not on the face of the Bankruptcy Code. It's a 100-plus-year-old doctrine that was judge-made. They applied that doctrine to conclude, as a matter of law, that there was no preference. They then took the phrase, interest of the debtor in property, and the district court, as other courts have done, have concluded that when there is earmarking, there is no transfer that's avoidable as a preference. And they took that same conclusion and applied it to the fraudulent transfer statute. That's why we spend a lot of time distinguishing.  That's descriptive of what happened. I get that. But why is it then when, in your view, this transaction enters a fraud world? You're very clear about that. I get that. Why is it that when we move out of the preference world and we move into the fraud world, that you say, everything in that preference world with respect to this equitable doctrine just falls by the wayside? Is there some legal work that the fraud is doing? In other words, why couldn't you say, as Mr. Schreiner does in his briefing, talking about the same statutory text, let's just overlay the same equitable doctrine on it? And what you're saying in your brief and what I'm trying to figure out is the why. We have a fraud situation here. And you say, when we have a fraud situation, we need to apply 544 and 548. And is it that when we enter a fraud world that the code just takes on more strength? Or what's going on there? I think I understand Your Honor's question. And from my perspective, the answer is the purposes of the statutes are different. Okay, explain that. The purpose of the preference statute is to avoid a race to assets and so that all creditors get treated similarly. So no one gets more than another would have gotten had the transfer not been made. There's no actual intent any longer. There used to be, but under the bankruptcy code now, there's no actual intent of the debtor to confer a preference. It's strict liability in a sense. It's not looking to punish transactions that are done with actual intent to defraud. The actual intent to defraud gets at transactions that are culpable where there's wrongdoing. So there's a different purpose, and in connection when you have like a Ponzi scheme, for example, you're trying to reconcile a different purpose than just a 90-day period with racing to assets. The purpose with respect to fraud is to prohibit those transactions, undo them, and make the third party who received the fraudulent transfer share that loss equally with other creditors of the estate, assuming that they're not also culpable. Mr. Klein, if the money is clawed back here, what would happen to Millennium? Millennium's not a creditor of the estate, is it? Because its agreement was with LSQ. It didn't. Correct me if I'm wrong. I believe that's incorrect, Your Honor. Millennium has a contract with the debtor. They extended the funds. They filed a proof of claim for in excess of $10.3 million. They're the largest creditor. LSQ would have been a creditor but for the fact that they would pay. If they disgorge the funds, they will then line up as a creditor, and they will share rateably with all other unsecured creditors, and effectively, if you ignore all the other creditors that I articulated, if it was just Millennium and LSQ, both of whom were defrauded by the debtor, there would be $10.3 million in the estate. Both would get 50 cents on the dollar, assuming that LSQ is not equitably subordinated. They would share their loss rateably, and that's consistent with the Supreme Court's precedent in Cunningham v. Brown. And unless Your Honors have more questions for me, I'd like to reserve the balance of my time for rebuttal.  Thank you. Thank you, Your Honors. Mr. Schreiner, good morning. Good morning, Your Honor. May it please the Court, I want to talk briefly, very briefly, but I think it's important, about the waiver argument that we made in this case. There's been massive waiver of arguments in this case, starting from issues that were waived, they're not raised in the bankruptcy court. The district court pointed that out. The district court pointed out that this was litigated by the trustee in the bankruptcy court as a claim to recover the transfer of money from Millennium to LSQ. Despite the fact that, as I guess your questions are sort of asking, both you and Judge St. Eve's questions are asking, what's the difference? And I'll get to that. But this is a case where arguments weren't made that are now being made, were being made for the first time in the district court. They came to the district court and said, well, really this was about factoring, and factoring is like this. And Judge Ludwig said, no, you didn't raise that below, that's been waived. There have been many other claims that have been raised for the first time in this court. The whole 547C argument, that we should somehow infer something from the fact that there's an affirmative defense in 547C, I still don't understand the argument. My point is, it wasn't raised below. It wasn't litigated below. We didn't get a chance, the two judges below didn't get a chance to look at that. This court said in the Weber case, which was about a 1992 case, we impose waiver rules for a purpose. We don't want people trying it out in the minor leagues and coming up here to try their real case. And that's a lot of what's going on here. I just want to make that as a background point. It arises frequently here. The earmarking applies to 547. Maybe let me just cut through this on the 547. You asked the question, Judge Scudder, why are they emphasizing 548 rather than 547? Why is that so important? Well, the answer is, they're going to lose on 547. They're wrong under the case law on 547. There is no president from this court saying that the same rules of what an interest of the debtor and property of the state, transfer of the interest of debtor and property of the state, is under 548. There are a number of them. I count about half a dozen from other courts of appeals, lots of them from lower courts, including a number of bankruptcy courts, which we cite, saying the same analysis that is used to say what is a transfer of interest of property of the state applies in 548. After all, Congress used the same words. And that wasn't unintentional. That language wasn't in the predecessor to 548 in the Bankruptcy Act. All there had to be was a transfer of property, and it was often somebody else's property. Now it has to be an interest of the debtor and property of the estate, an interest of the debtor. So it gets back to a difference. So is that to say, though, I understand that point. The same statutory text appears across those provisions. I understand the canon about it. The one thing that I've struggled with here is that when I think about the procedural posture that we're in, and I look at the briefing, I look at what went in, summary judgment in the bankruptcy court. It looks to me like your client smelled something quite rotten, and it approached what will become the debtor, Engstrom. And it said, we want to put these receivables back to you. We want out of this. And there's this whole set of events, and there's this whole set of meetings that way. And then you get out when the new financing comes in with Millennium. That way, Millennium steps into the same exact assets that way. And I'm not trying to get in the middle of whatever's going on between Millennium and LSQ that way. Not in Florida. In Florida. Where the case had been pending. Right. But it sure looks like, from the standpoint of Engstrom, that there was fraud going on here. I think very little doubt that there was fraud going on here. The question of whether or not my client, LSQ, was aware of it, I don't think that's established. You say, well, it smells like it. Well, who knows? I don't know if it's established or not, but we're at the Rule 56 stage. Well, which requires that the party opposing summary judgment come up with something more than what they came up with here on that point. Does it matter if your client knew? I don't think it does. Why not? At all. Because we didn't argue this case, and it wasn't decided on the basis of 548A1A or B. It was decided on the first element of the case. Is this a transfer of an interest of the debtor's property? Yeah, see, I struggle with that a little bit. And the reason I do is because I understand the way the transaction was structured. Right. But it seems that the structuring is the economic equivalent of a different approach that could have been taken. In other words, Millennium could have paid Engstrom $10 million, and then in the next nanosecond, Engstrom could have wired it to LSQ. But that didn't happen. No, no, no. But the point is it didn't happen, but Engstrom was the one that made the directive, right, or said wire the money over to LSQ. I don't know that, Your Honor. For all I know, it seems to make a lot of sense to me that Millennium would do it for its own reasons to make sure that it wasn't caught up. Well, it's binary, though. Millennium's only going to give the money to one of two. Millennium is going to make the loan or not. And to get back to my point, I haven't done as much asset-based financing as my friend has done through the years. But do people who lend on the security of accounts receivable and other soft inventory sometimes smell a rat not knowing what it is? I have no doubt of that. I have no doubt that there was something that didn't seem right about this, whether it was a suspicion of fraud or they didn't like something about what they saw. They, as we used to say, threw them out of the bank. That's exactly what happens in this situation. Go get somebody else. And Millennium stepped up and wanted it. It's Millennium, as far as we know, was the source of the – there isn't anything on the record to establish that debtor made the direction. The debtor acceded to it. So, Your Honor, would it matter under – with Judge Scudder's hypothetical if this were really a two-step transaction? Yes, it would. If it went from Millennium to the debtor and then the debtor to LSQ with the direction it has to be paid to LSQ, would it matter? I think it would under this court's cases. Orsco, which Judge Ripple wrote, and Smith, its predecessor, Judge Cuddehay wrote, where Judge Fong dissented. The whole thing was about that. Did it stop in the middle? Was there an opportunity for the debtor to make a choice – these were preference cases – to make a choice to pay off some preferred creditor? And the finding in both cases was yes. And people read the law, and they say, people like Millennium, I don't want to get in this mess. I want to buy that loan. I want to take over the position. Is that elevating form over substance, though? That never happens in the law, Your Honor. It isn't elevating form over substance. It's people looking at what the law says, and the law says – and look at the Orsco case. We talk about this. It has to be controlled. The same thing was said in the Smith case. It has to be controlled. That's the element of what we sometimes call the earmarking doctrine. The debtor has to have an opportunity to divert those funds to a preferred creditor. What about the accounts payable? Did the accounts payable go back through the debtor? No. The accounts payable went to him. What happened here was this was an Article IX security interest in the accounts receivable, okay? And Judge Ludwig said that, too. That's the way that was litigated in the courts below. What happened was the money went from Millennium to LSQ. LSQ released its security interest, and Millennium's popped into effect. No change in the property of the debtor. Oh, hold on. Okay, so LSQ never held title to the factored receivables? Bare legal title. The reality of it is they were always leveraged up. I mean, they were always secured up all the way through. They were secured up to one creditor, and now they're secured up to another creditor. So when your client put them back, basically, said, we want out of this thing. They just released their Article IX filings. That's it? That's all you did? That's all they did. It's a very straightforward, and it's the way it was litigated down below. It's a very straightforward case. The transfer went directly to the third party, from the third party lender to the old third party, new lender transfers the money to old lender, and it's exactly what these cases are about. Even this court, which hasn't officially accepted the earmarking doctrine, has said with respect to the language transfer of interest to the debtor and property in 547, it hasn't had a 548 case, in 547, that looks to whether the debtor had an opportunity to control it. The Smith case was a good case. That's where there had been a, what do they call it, temporary credit that the bank had given when the check, a bad check was deposited in the account, and using the apparent balance in the account, the debtor had written a check to one of its creditors. And the debate between the majority in that case and Judge Flom, who was in dissent, was about whether or not that was enough to establish control. And the majority, Judge Kennedy wrote it, said, well, it was enough to give him the ability to write the check. That's enough. And Judge Flom said, well, no, that was the bank's money. It was not in the interest of the debtor in this case. He lost. But they all agreed on the importance of control. That is, the debtor's ability to divert it. Now, whether that's a part of a fraudulent transfer, or that's a part of the, what's the word I want, preference. It's hard to see, though, here, how Engstrom could not have said, here's the way we want it done. They weren't in control. They were looking for a new lender. They were doing what they were told. I mean, that's the economic reality of this. This had to be the way that the new lender wanted it structured, or it wouldn't have happened that way. And the new lender didn't say, this is your money. You can do what you want with it. The new lender said, we're going to pay it directly. It is a part of a deal with the debtor. We're going to pay it directly to the old lender. And, you know, if I may, just because we've got some things that were in the reply brief that hadn't come up before. We never heard about the Begier. I don't know whether it's Daubert or Daubert. Begier, I don't know, whatever the case was, the Supreme Court case Justice Marshall wrote back in the 70s, where he basically said those important points being that just the ones that you were asking about, Judge Saini, you know, is it the real essence of the avoidance power. And 547 and 548 are both avoidance powers, was to not deplete the estate, the coming estate, of ability of something with which to pay the creditors. This $10 million was never going to be in the debtor's estate. The debtor, you know, the debtor had parted with the ability to control that years earlier when it gave a security interest to LSQ. And then parted with it again. There wasn't going to be anything there for the creditors. My friend says, well, you know, there's $220,000 of other unsecured creditors out there. They're not going to get anything. They're buried under Millennium if he's right, under LSQ if we're right. It just isn't real. I just do want to tell you one other case that I think responds to this point about we've got the presumption wrong on what happens when the language in the statute is the same. And that's Gustafson v. Alloyd, which I see you nodding, Judge Gutter. You know, it's a 33 Securities Act case. And the question there is, does the language in Section 10, prospectus, when it's put into Section 12.2 mean the same thing? And the Supreme Court of the United States says, yes, it does. That's the presumption. Had Congress meant the term in 12.2 to have a different meaning than the same term in 10, that is when one would have expected Congress to have been explicit. Congressional silence cuts against, not in favor, of Alloyd's argument. The burden should be on the proponent of the view that the term prospectus means one thing in 12 and another in 10, to do strong textual support. That's what the trustee has not done here. Explain why Congress put that language, interest of the debtor and property of the estate, into 548 where it hadn't been before. And that sort of distinguishes, if you will, all of that ancient history from the early part of the 20th century when these cases where that wasn't the language of the 67D or whatever it was in the Act. I think the trustee attempts to rebut that presumption by saying, at least for the fraudulent transfer provision, that it's inconsistent with the bankruptcy codes. I don't think it's inconsistent. It's the first step in what Congress said is a fraudulent transfer claim. You then got to come along and yeah, okay, you can make the point that you don't have to show that a particular creditor was hurt under 548A, but you got to get there first. And whether it's in 548 or 544B, the other one. So what you're saying is that I think what you're arguing is that that element, the reality of control is kind of embedded in that statutory text. That's exactly right. And it was picked up for 547 because the statute was different. Congress changed it. And I think in the course of the 45 years now since the bank, I hate to say that because I was practicing under the Act, but in the course of that time, the courts have caught up with the significance in these rare cases of somebody trying to use either 547 or 544. So, Mr. Schweiner, would you also say, therefore, that to rule in LSQ's favor doesn't require any application of the earmarking doctrine? That's right. It requires the court to follow the same logic and the same thinking that it did in Smith, that it did in Morskow. It just requires us to define an interest of the property of the debtor, which appears in both statutory positions. That's right. And, you know, they say, well, we haven't done this before. There are other courts of appeals that have adopted the earmarking doctrine. Most of them, with respect to it, have adopted this control notion with respect to what it means to be a transfer of the interest of the debtor. One case that, again, was cited in the reply brief that we didn't get an opportunity to respond to, the trustee relies on a case called Moses from the bankruptcy appellate panel in 2000. Well, the Tenth Circuit rejected that in a case called Wagon Connect in 2020, which we cite in our brief. And the bankruptcy appellate panel of the Tenth Circuit has just said, yeah, that's what happened. Moses is no longer good law. We're not going to file it. I appreciate it. Thank you, Your Honor. Yeah, very well. Mr. Kline, we'll give you probably, say, six minutes just to keep this balanced out. Thank you, Your Honor. To respond to a couple points that were made by my friend, you asked him, Judge Scudder, about whether this was a financing with LSQ who owned the accounts. The LSQ factoring agreement, which is in the record, states in paragraph two, seller shall sell to purchaser as absolute owner, and purchaser shall purchase from seller's accounts. It was an absolute ownership to LSQ. They filed the financing statement because the Uniform Commercial Code requires, when there's a sale of accounts, to file a financing statement to put other parties on notice. It doesn't turn the transaction into a leveraged finance transaction. When Millennium then entered into its factoring agreement with Engstrom, that, too, was a purchase and sale agreement that required absolute transfer of the accounts. So what happened under the Engstrom agreement with Millennium was they had to repurchase the accounts from LSQ, pay them the $10.3 million, and then simultaneously sell those accounts to Millennium in order to receive the $10.3 million. So that's one point. Second, and importantly, we spend a lot of time in our briefs on statutory interpretation. It's our submission that the earmarking doctrine is applicable only to 547 because it's judicial gloss. This court has said in Kmart they put a stop to judicial gloss, but the circuit courts elsewhere are in agreement that it's a judicially created exception. It's an equitable exception. Exception or interpretation? Exception, Your Honor. Why? Because the interpretation of the words transfer of interest to the debtor and property say nothing about control, and there is no diminution requirement on the face of the statute. As this court said in Smith and, again, in Your Honor's opinion in Warsko versus Preferred Technologies, the diminution requirement is not found in the statute, but it's been used by courts, and you did not disturb it then. But that was a requirement with respect to preferences because you're looking with respect to preferences for a different purpose where other creditors harmed as a result of the transfer. Those requirements, control and diminution, you won't find them in the fraudulent transfer statutes that look at actual intent to the fraud, particularly with respect to the 544 action, which goes to state law. The trustee steps into the shoes of an individual creditor. There's no earmarking doctrine under state law. There's no earmarking doctrine with respect to fraud, period. The words are interest of the debtor and property. All this court needs to determine is whether the debtor had a contract interest in these funds. It did. There are no exceptions. Thank you, Your Honor. Okay. Hold on, one question. Going back to what – how does it make sense to think of the earmarking doctrine as an exception? Your Honor, I mean, that just seems – I mean, your answer surprised me. I thought what you were going to say is judicial gloss, meaning it's just an equitable overlay. In other words, when Congress enacted the Bankruptcy Code in 1978, it did it against the backdrop of these equitable principles, and courts have kind of said that one of those principles is this thing we call the earmarking doctrine. And it kind of just – it sits on top of – it provides this kind of gloss on 547. Right. It's odd, though, to call it an exception. Your Honor, I think this court in Smith referred to it in that respect, and the other courts also. The exception is not a statutory exception. It's a judicial exception. It was federal common law when it was created, and originally it came out of the diminution doctrine, which was federal common law. And so is the point then that you shouldn't put the gloss on – just focus on 548. You shouldn't put the gloss on 548 because 548 is dealing with an altogether different situation of fraud. That's correct. And an equitable doctrine that's about fairness and about trying to avoid double payments by guarantees and the guarantors and what have you. It just doesn't have a place in 548. Is that the point? That is the point, Your Honor, and the focus primarily is that that doctrine came out of a notion of diminution, looking at whether the other creditors got less as a result of the transfer. And if there's no diminution, so the courts looked at over 100 years ago, they determined there to have been no preferential transfer. Diminution is not a component of fraud, of actual intent of the fraud. The concept around diminution has applicability when you're looking at constructive fraud and reasonably equivalent value and things of that nature, but not with respect to actual fraud. So the basis of the judicial doctrine has no application to fraud. Okay, one final question if you don't mind. I don't mind. If we all together changed the fact pattern and we assumed, contrary to the way this has been briefed and everything, that LSQ had not a clue that something was amiss at Engstrom. They just wanted out of the deal. And they exercised a contractual right, but they didn't have any sense that, what is this entity, Next Extra or whatever it is, Next Era, you know, and the individual running Engstrom, it was not fishy. Does the legal analysis change? Not with respect to the issue that's on appeal in this court. The legal analysis does not change because LSQ was lucky in that respect, even if they didn't know. The court, the code looks to actual intent of the fraud. The intent of the fraud is not the transferee's intent. It's the debtor's intent. So why so much emphasis then in your briefing in the bankruptcy court on Engstrom acting in concert with LSQ? What's the legal significance of that? I think it has multiple parts to answer that question. Part of it was, if you accept the notion that was argued below, and we state in our briefs here, that the earmarking doctrine is an equitable doctrine. The argument was made in the courts below that if, as an equitable doctrine, these facts matter about whether the beneficiary of the payment was somehow in cahoots with the debtor. We aren't making those arguments with respect to this appeal. We're focusing exclusively on whether there was a transfer of an interest in the debtor. And we have reiterated the pleadings below with respect to alleged participation. But that goes to, as we noted in our brief, if LSQ disgorges, they will become a creditor. Even if they were a good faith transferee, they will have that argument as well. If they gave value, they will have that argument as well. But if they can't meet that test for a good faith transferee who gave value without knowledge of the voidability of the transaction, which we believe they won't be able to meet, they will have to disgorge. They will then line up and receive a pro rata share of the estate unless they get equitably subordinated based on their participation in the fraud. That's another step. If that occurs, that occurs below. Okay. Very well. Mr. Klein, thank you. Mr. Schreiner, thanks to you. Thank you, Your Honor. I appreciate the high quality of the argument and briefing. We'll move to our second case of the morning. Thank you.